UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

No 11-CV-2292 (JFB)
_____

JOSE TOXTLE,

Petitioner,

VERSUS

JOHN LEMPKE,

Respondent.
_____

**MEMORANDUM AND ORDER**
June 18, 2012
_____

JOSEPH F. BIANCO, District Judge.

Jose Toxtle (hereinafter "petitioner" or "Toxtle") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction in the County Court, Nassau County, State of New York. Petitioner was convicted in a judgment rendered on June 24, 2008, following a jury trial, of Murder in the Second Degree (N.Y. Penal Law § 125.25(1)) and Criminal Possession of a Weapon in the Fourth Degree (N.Y. Penal Law § 260.01(1)), and was sentenced to concurrent terms of imprisonment of twenty-five years to life for his murder conviction, and one year imprisonment for his weapon conviction.[1]

In the instant petition, petitioner challenges his conviction, claiming his constitutional rights were violated because: (1) the County Court improperly charged the jury on matters relating to sentencing and punishment; and (2) petitioner received ineffective assistance of counsel.

For the reasons discussed below, the petition is denied. Petitioner's claim that the County Court improperly charged the jury on matters relating to sentencing and punishment is procedurally barred and, in the alternative, fails on the merits. Furthermore, petitioner's claim that he received ineffective assistance of counsel is also without merit.

I. FACTUAL BACKGROUND

The Court has adduced the following facts from the instant petition and the underlying record.

---

[1] As will be discussed *infra*, petitioner's sentence was reduced to twenty years to life.

At approximately 12:40 a.m., on December 11, 2007, petitioner dialed 911 and reported that he had just killed his wife. (T. 325-326, 446.)[2] The Nassau County Police responded and entered the basement apartment that petitioner shared with his wife, Teresa Barrera ("Barrera").[3] (T. 350.) The police discovered Barrera's lifeless body, with eight sustained stab wounds and multiple incised wounds, lying in a pool of blood on the floor of the bedroom she shared with petitioner.[4] (T. 350, 538.) Petitioner, who was covered in blood, was taken into custody after he identified himself as the perpetrator. (T. 349, 498-504.) He subsequently made a written and videotaped confession to Nassau County Police Officers and a Nassau County Assistant District Attorney. (T. 384-85, 438-46.) Petitioner's neighbors, Hector Estrella and Adriana Natividad, also reported that at approximately 12:30 a.m., on December 11, 2007, they heard an "ugly scream," and then petitioner, covered in blood, "[T]old him, Hector, I am speaking with 911 beacause I just killed Terry."[5] (T. 330, 339.)

An ensuing police investigation revealed that, in 2001, petitioner met Barrera in Mexico where he worked as a lawyer, and then petitioner illegally entered the United States and married Barrera in Westbury, Nassau County, later that same year. (T. 439-40, 584.) By 2007, the year of the present incident, petitioner and Barrera's marriage exhibited problems, and one week before the murder, Barrera informed petitioner that "she needed time to think about her relationship with [him]" and "she wanted to go to Boston to stay with her family."[6] (T. 440-41.) When Barrera returned to petitioner five days later, she was carrying flowers, a book, and a teddy bear, which she claimed her nephew and niece had given her. (T. 441-42.)

The following morning, petitioner found a receipt from a store in Connecticut for the book Barrera brought home the previous day. (T. 442.) He also found a shot glass that said "Connecticut" on it.[7] (T. 442.) Later that evening, petitioner noticed that Barrera was on the computer talking to someone in a chat room, and that someone kept calling her "my love" on the screen. (T. 443.) When petitioner inquired as to who was calling her "my love," Barrera responded, "[N]o, no, you didn't see anything like that." (T. 443.) Petitioner soon went to bed and awoke in the middle of the night to find Barrera in the bathroom whispering to someone on her cell phone. (T. 444.) Petitioner then waited for Barrera to go to sleep, and subsequently checked her cell phone for all incoming and outgoing calls. (T. 444.) Upon discovering that all her calls were erased, petitioner

---

[2] The following facts were taken from the trial transcript (T.), and the sentencing minutes (S.). The trial took place from June 18, 2008 through June 24, 2008, and the sentence was imposed on July 14, 2008.

[3] Petitioner's apartment was located at 195 Garden Street in New Cassel, Nassau County, New York. (T. 347.)

[4] Both Barrera and petitioner were forty-two years old at the time of the stabbing. (T. 439, 537.)

[5] The residence where the stabbing occurred appears to be a single-family house from the outside, but the basement acts as a boarding house with three rooms rented out. Petitioner and Barrera lived in one of the rooms, and Estrella and Natividad lived in another. The three rooms share a common living area, a kitchen, and a bathroom. (T. 329.)

[6] There was testimony at trial that petitioner and Barrera's marriage exhibited problems partly due to the financial stress and the burden of Barrera working two jobs to make ends meet, while petitioner was unemployed and receiving workman's compensation due to a shoulder and hip injury he sustained in approximately 2004. (T. 440-441, 592.) Barrera worked full-time at Nassau University Medical Center, and part-time at Hick's Nursery. (T. 440-41.)

[7] Petitioner found the book receipt on his driveway, and he found the shot glass in the backseat of his car. (T. 442.)

checked Barrera's cell phone contacts, where he found one number with a Connecticut area code. (T. 444.) Petitioner proceeded to dial the Connecticut number, and was greeted by a man saying "[H]i, mi amor." (T. 444.) When petitioner confronted the man about his relationship with Barrera, the man, whom police determined to be Justino Macuitel-Amario, hung up and did not answer petitioner's subsequent call.[8] (T. 444.)

Petitioner went back to his room to find Barrera awake, and confronted her about the shot glass, the book receipt, and the man from Connecticut, to which Barrera replied, "so," and left the room with a cigarette. (T. 444-45.) When Barrera returned, petitioner got down on his knees and pleaded for Barrera to reconsider their relationship. (T. 445.) Barrera stated, "I don't see a future with you . . . I love that other guy. You don't make me happy." (T. 445.) When petitioner's pleas persisted, Barrera started laughing and said, "[you're] not good for sex," and told him that he had "[a] little penis." (T. 445.) At this point, petitioner, who was still on his knees, grabbed a woodcarving knife from his night table, and concealed it behind his back.[9] (T. 445-46, 593.) When Barrera stated, "I've been with other people. What do you think? Your niece's husband, when I went to Colorado, and my [ex-]husband, Victor, you think they're the only ones," petitioner revealed the knife and stabbed Barrera eight times. (T. 446, 593.) Barrera screamed, "[T]hink of your daughter, think of my daughter," to which petitioner replied, "[I]f you're not for me, then you're not for anybody."[10] (T. 446.) After Barrera fell to the ground whilst screaming for her neighbors, Estrella and Natividad, petitioner dialed 911 and reported that he had killed his wife.[11] (T. 446.) Nassau County Police Officers responded to the scene and arrested petitioner, who was subsequently indicted in County Court, Nassau County, on one count of Murder in the Second Degree pursuant to New York Penal Law Section 125.25(1), and one count of Criminal Possession of a Weapon in the Fourth Degree pursuant to New York Penal Law Section 260.01(1). (T. 349.)

## II. PROCEDURAL BACKGROUND

### A. State Court Proceedings

#### 1. Plea Bargaining and Trial

Prior to trial in the County Court, the Nassau County District Attorney's Office engaged in plea bargaining with petitioner and offered to recommend a sentence of twenty years to life imprisonment in exchange for a guilty plea. (S. 14.) Petitioner refused to enter a guilty plea and proceeded to trial on June, 18, 2008, proffering the defense that he had been suffering from extreme emotional disturbance and was only guilty of manslaughter, rather than murder. (S. 3.) The defense's only witness was Dr. Lawrence Siegel, an experienced medical doctor with a specialty in psychiatry and a

---

[8] A stipulation was entered into by the parties that, if Justino Macuitel-Amario were called to testify, he would testify that he met Teresa Barrera on the internet, that they were together in Connecticut on two occasions, that they had sexual relations, and that he received the phone call from petitioner. (T. 550.)

[9] The knife had been left on petitioner's night table the previous day when petitioner used the knife to cut the stems on flowers he purchased for Barrera and placed in their bedroom. (T. 593.)

[10] Barrera had two children from a previous marriage: her daughter Eva was twenty-one at the time of trial, and her son Jesus was eighteen at the time of trial. (T. 318-19.) Petitioner has three children from a previous marriage living in Mexico. (T. 583.) Both Barrera's and petitioner's previous marriages ended in divorce. (T. 320, 583.)

[11] Petitioner was on the phone with 911 as he went to his neighbors' room to relay that he killed his wife. (T. 446.)

3

subspecialty in forensic psychiatry.[12] (T. 568.) Dr. Siegel testified that after meeting with petitioner on four separate occasions, he believed that petitioner had been under severe external stress, had been in a high emotional state at the time of the killing, and that the killing had been spontaneous, all of which were factors that he commonly associated with a person suffering from extreme emotional disturbance. (T. 581, 594-618.) When asked whether high emotion caused the stressors petitioner was experiencing, Dr. Siegel replied, "No. The Stressors were caused by the external events, the infidelity of his wife, the sudden awareness of it in their difficult relationship, one that he had hoped would continue." (T. 618.) On cross-examination, Dr. Siegel could not recall whether defense counsel had ever told him prior to his testifying that the defense was seeking to establish, by Dr. Siegel's testimony, that petitioner acted under extreme emotional disturbance. (T. 622-23.)

2. Jury Charge

The trial court charged the jury on June 24, 2008. First, the trial court charged the jury on "[g]eneral principles," which included a charge that the jury's "[f]undamental duty . . . is to determine the facts," that the jury "not consider or speculate about matters relating to sentence or punishment," that sentencing petitioner was "[a] matter [the court] alone must determine under our rules of law," that the jury was "not to consider or discuss any matters relating to sentence or punishment during [the jury's] deliberations," and the court repeatedly emphasized that the jury's duty was to base its verdict solely on the evidence before it. (T. 745-62.) The trial court then charged the jury on constitutional safeguards and petitioner's constitutional rights. (T. 762-73.) During this part of the charge, the trial court instructed the jury that extreme emotional disturbance is an affirmative defense to Murder in the Second Degree, and that the defense, if proven, "reduces the degree of the crime from murder in the second degree to manslaughter in the first degree." (T. 768.) Last, the trial court charged the jury as to the rules that govern their behavior while deliberating. (T. 773-83.) On June 24, 2008, the jury reached a verdict, finding petitioner guilty of Murder in the Second Degree (N.Y. Penal Law § 125.25(1)), and Criminal Possession of a Weapon in the Fourth Degree (N.Y. Penal Law § 260.01(1)). (T. 791-94.)

3. Sentencing

Petitioner appeared before the County Court, County of Nassau, for sentencing on July 14, 2008. Defense counsel moved to set aside the verdict, pursuant to C.P.L. §330.30, and claimed that the jury's verdict was against the weight of the evidence. (S. 3.) Defense counsel argued that the testimony given by Dr. Siegel had been sufficient to prove that petitioner had been suffering from extreme emotional disturbance, and that the jury should have found petitioner guilty of manslaughter, not murder. (S. 3.) After the court denied the defense's motion in all respects, defense counsel spoke on petitioner's behalf, reminding the court that petitioner had been cooperative in all of his dealings with the court, the police and the District Attorney's Office. (S. 5.) Defense counsel said that petitioner had no prior contact with the criminal justice system and had always tried

---

[12] Dr. Siegel serves as a clinical instructor at New York University, a supervisor at Bellevue Hospital, and has been teaching throughout his career. Dr. Siegel testified that he generally testifies for the prosecution more often than the defense, and that he had testified for the Nassau County District Attorney's Office on several occasions. (T. 568-77.)

4

to lead a good life by providing for his family and supporting his wife and her family as well. (S. 5-6.) Defense counsel also argued that petitioner had been suffering from depression and other mental ailments before and after the murder, and lived with a great deal of pain. (S. 7-8.) Defense counsel said that petitioner had taken responsibility for his actions, and still meant a great deal to his family and the victim's family.[13] (S. 8-9.) Defense counsel also reminded the court that petitioner would probably be deported to Mexico at the end of whatever sentence he served in the United States, and asked the court to take all of the relevant factors into consideration before sentencing petitioner. (S. 9-11.)

Petitioner then made a statement claiming he had been a wonderful husband to his wife before their marriage had problems, and that other women would have been "envious" of the way he had treated her. (S. 12.) Petitioner concluded by saying that he knew that being sorry would not bring Barrera back, and asked the court to do justice for Barrera. (S. 13.) After hearing statements from counsel and petitioner, the sentencing judge remarked on the disconnect that existed between the petitioner's view and the court's view of the case, and found petitioner's claim that he had taken good care of a woman he eventually "brutally slaughtered" to be "very offensive." (S. 13-14.) The court went on to say that in light of the "brutality with which the victim was slaughtered" and after considering petitioner's probation report and listening to petitioner's "offensive" comments in court, the court felt compelled to sentence petitioner to the maximum allowed by law of twenty-five years to life in prison, plus restitution in the amount of $18,450.13.[14] (S. 14-15.)

4. Appeals

Petitioner appealed his conviction and sentence to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department, on the grounds that: (1) the County Court improperly charged the jury on matters relating to sentencing and punishment; (2) petitioner received ineffective assistance of counsel; and (3) the County Court's sentence was unduly harsh and excessive. In an Order dated December 7, 2010, a panel of the Appellate Division, Second Department, unanimously affirmed petitioner's judgment of conviction, concluding that: (1) petitioner's contention regarding the jury instruction on extreme emotional disturbance was unpreserved for appellate review and that, in any event, the jury instruction at issue was not improper in that it did not direct the jury to consider matters relating to sentencing or punishment; and (2) petitioner was not deprived of effective assistance of counsel. *See People v. Toxtle*, 79 A.D.3d 950 (2d Dept. 2010). The court did, however, rule that petitioner's sentence was excessive and, as a matter of discretion in the interest of justice, reduced the sentence imposed on petitioner's murder conviction from twenty-five years to life imprisonment to twenty years to life imprisonment. *Id*. Leave to appeal to the New York Court of Appeals was subsequently denied by Order dated March 28, 2011. *See People v. Toxtle*, 16 N.Y.3d 837 (2011).

---

[13] Barrera's daughter, Eva, indicated in the pre-sentence probation report that, although she felt petitioner should be punished, she did not believe petitioner should spend the rest of his life in prison. (S. 9.)

[14] The State requested a sentence of "not less than the maximum" of twenty-five years to life in prison, and the defense requested a sentence of "eighteen years to life, or no more than twenty years to life." (S. 5, 11-12.)

5

B. The Instant Petition

On May 5, 2011, petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that: (1) the trial court improperly instructed the jury by asking the jury to consider the potential sentence petitioner would receive if the jury accepted petitioner's affirmative defense of extreme emotional disturbance; and (2) petitioner was denied effective assistance of counsel. On September 2, 2011, the respondent filed a declaration and memorandum of law in opposition to the petition. On September 23, 2011, petitioner submitted a memorandum and declaration in reply. The Court has fully considered the arguments and submissions of the parties.

III. STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, governs applications of incarcerated state court defendants seeking federal habeas corpus relief. Pursuant to 28 U.S.C. § 2254(d), an application for writ of habeas corpus that has met the procedural prerequisites

> Shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented by the State court proceedings.

28 U.S.C. § 2254(d). "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (citing *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)); *see Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006).

Once claims have been adjudicated on the merits, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-12 (2000); 28 U.S.C. § 2254(d)(1). Alternatively, "a federal habeas corpus court may grant the writ if the "state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies it to the facts of a Petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (citing *Williams*, 529 U.S. at 413).

AEDPA establishes a deferential standard of review. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *see Wiggins*, 539 U.S. at 521 (holding that for the "unreasonable application" prong of the AEDPA to be satisfied, the state court's decision must have been "objectively unreasonable"). The Second Circuit has noted that although "[s]ome increment of

6

incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law are reviewed de novo.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)). Under the AEDPA, determination of the factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1).

## IV. DISCUSSION

For the reasons discussed *infra*, the Court denies petitioner habeas relief. Petitioner's claim that the trial court improperly instructed the jury by asking the jury to consider the potential sentence petitioner would receive if the jury accepted petitioner's affirmative defense of extreme emotional disturbance is procedurally barred and, in the alternative, fails on the merits because petitioner's claim is simply not supported by the trial record. Petitioner's claim that he was denied effective assistance of counsel is also without merit because his trial counsel's representation was objectively reasonable, and there is no reasonable probability that, but for trial counsel's alleged errors, petitioner would have been found guilty of Manslaughter, rather than Murder in the Second Degree. The Court addresses each claim in turn.

### A. Procedural Bar

As a threshold matter, respondent argues that petitioner's claim that the trial court improperly charged the jury on matters relating to sentencing and punishment is procedurally barred from habeas review by this Court. (Res. at 3-7; Pet. at 4.)[15] The Court agrees. The Appellate Division's conclusion that this claim was unpreserved for its review was based on an independent and adequate state procedural ground.[16] Thus, petitioner's claim that the trial court improperly charged the jury on matters relating to sentencing and punishment is procedurally barred from habeas review.[17] In any event, even assuming *arguendo* that this claim was reviewable, this Court, in the abundance of caution, has examined it on the merits and concludes that it is meritless.

### 1. Legal Standard

A petitioner's claims may be procedurally barred from habeas corpus

---

[15] ("Res.") refers to the respondent's brief in this action. ("Pet.") refers to the petitioner's brief in this action.

[16] Though respondent also argues that petitioner's claim is also procedurally barred because it does not present a federal constitutional question, as will be discussed *infra*, the Court will proceed as if petitioner's claim regarding the jury charge is a claim that his due process rights were violated. (Res. at 3-4.)

[17] Though the petitioner claims that the trial court's sharing of its judicial duty to consider petitioner's sentencing with non-judicial individuals constitutes an error that affects the organization of the court or the "mode of proceedings described by law," and, thus, is an exception to the procedural bar, the Court, as discussed *infra*, finds no factual basis for petitioner's claim that the trial court instructed the jury on matters relating to sentencing and punishment. (*See* Petitioner's Reply Brief in this action ("Pet. Reply") at 4 (citing *People v. Ahmed*, 66 N.Y.2d 307 (1985) (quoting *People v. Patterson*, 39 N.Y.2d 288, 295 (1976)).)

7

review if they were decided at the state level on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729-33 (1991). To be independent, the "state court must actually have relied on the procedural bar as an independent basis for its disposition of the case," *Harris v. Reed*, 489 U.S. 255, 261-62 (1989), by "clearly and expressly stat [ing] that its judgment rests on a state procedural bar." *Id.* at 263 (internal quotation marks omitted). The procedural rule at issue is adequate if it is "firmly established and regularly followed by the state in question." *Garcia* v. *Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (internal quotation marks omitted). However, there is a "small category" of "exceptional cases in which [an] exorbitant application of a generally sound [procedural] rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 376, 381 (2002). Nevertheless, "principles of comity . . . counsel that a federal court that deems a state procedural rule inadequate should not reach that conclusion lightly or without clear support in state law." *Garcia*, 188 F.3d at 77 (quotation marks omitted).

If a claim is procedurally barred, a federal habeas court may not review the claim on the merits unless the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Coleman*, 501 U.S. at 750. Petitioner may demonstrate cause by showing one of the following: "(1) the factual or legal basis for a petitioner's claim was not reasonably available to counsel, (2) some interference by state officials made compliance with the procedural rule impracticable, or (3) the procedural default was the result of ineffective assistance of counsel." *McLeod v. Graham*, No. 10 Civ. 3778 (BMC), 2010 WL 5125317, at *3 (E.D.N.Y. Dec. 9, 2010) (citing *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994)). Prejudice can be demonstrated by showing that the error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003). A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To overcome procedural default based on miscarriage of justice, petitioner must demonstrate that "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" and would require "new reliable evidence . . . that was not presented at trial." *House v. Bell*, 547 U.S. 518, 536-37 (2006).

                2.      Application

Petitioner's claim that the trial court improperly charged the jury on matters relating to sentencing and punishment is procedurally barred because the state court relied on a firmly established procedural rule to deny this claim. The Appellate Division denied petitioner's motion to vacate the jury's verdict, ruling that petitioner's claim was unpreserved for appellate review since petitioner's defense counsel did not object to the language used by the trial court during the jury charge, nor did he request a different instruction on the basis that the court's instruction was improper. *People v. Toxtle*, 79 A.D. 3d at 950 (citing New York Criminal Procedure Law § 470.05(2) and *People v. Gray*, 86 N.Y. 2d 10 (1995)): *see also* T. 564-65, 670-73, 781-82. In the alternative, the Appellate Division held that petitioner's claim failed on the merits because the trial court did not instruct the

8

jury to consider matters relating to sentencing and punishment. *Id.*

Failure to preserve an issue for state appellate review by not objecting to the language used by the trial court during the jury charge or not requesting a different jury instruction on the basis that the trial court's instruction was improper is an adequate and independent procedural ground recognized in New York State. *See* N.Y. CPL § 470.05; *Murray v. Carrier*, 477 U.S. 478, 485-93 (1986) (contemporaneous objection rule);[18] *see also* (contemporaneous objection rule is an independent and adequate state ground); *Wainwright v. Sykes*, 433 U.S. 72, 86-92 (1977) (same); *Glenn v. Bartlett*, 98 F.3d 721, 724-26 (2d Cir. 1996); *Owens v. Portuondo*, No. 98-CV-6559 (AJP), 1999 WL 378343, at *6 (S.D.N.Y. June 9, 1999); *Torres v. Irvin*, 33 F. Supp. 2d 257, 263-65, 273-75 (S.D.N.Y. 1998); *Vera v. Hanslmaier*, 928 F. Supp. 278, 285 (S.D.N.Y 1996) ("Failure to object at trial is an independent and adequate state procedural bar."); *Jamison v. Smith*, No. 98-CV-3747 (FB), 1995 WL 468279, at *2 (E.D.N.Y. July 26, 1995) ("Courts in this circuit have consistently held that the failure to object contemporaneously . . . constitutes an adequate and independent basis for barring habeas review."); *Anderson v. Senkowski*, No. CV-92-1007, 1992 WL 225576, at *4 (E.D.N.Y. 1992), *aff'd*, 992 F.2d 320 (2d Cir. 1993). As stated *supra*, the Appellate Division held that this claim was unpreserved for review. (*People v. Toxtle*, 79 A.D. 3d at 950.) Thus, because the Appellate Division ruled on petitioner's claim that the trial court improperly charged a jury on an independent and adequate state law ground, the Court is procedurally barred from reviewing this claim.

Furthermore, the fact that the Appellate Division ruled in the alternative on the merits of petitioner's jury charge claim does not preserve petitioner's claim for review. *People v. Toxtle*, 79 A.D. 3d at 950; *see also Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810-11 & n.4 (2d Cir. 2002) ("where a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved"); *Glenn v. Bartlett*, 98 F.3d 721, 724-25 & n.3 (2d Cir. 1996) (holding that state decision that denied prosecutorial misconduct claim as not preserved for appellate review represented an independent and adequate state procedural ground even though court addressed merits of claim "in the interest of justice"); *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) (holding that state decision denying claims as procedurally barred but also addressing merits rested on adequate and independent state ground).

Thus, federal habeas review of petitioner's improper jury charge claim is procedurally barred. Moreover, petitioner has demonstrated neither "cause and prejudice" for his procedural default, nor that failure to consider his claim will result in a miscarriage of justice. In his petition and memorandum of law, petitioner has wholly failed to explain why neither he nor his defense counsel objected to the language used by the trial court during the jury

---

[18] New York Criminal Procedure Law Section 470.05(2) provides, in relevant part, that:

> For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same.

N.Y. Crim. Proc. Law § 470.05(2).

9

charge, and why they both failed to request a different jury instruction on the basis that the trial court's instruction was allegedly improper. Moreover, petitioner has failed to explain how this Court's failure to consider this claim would result in a miscarriage of justice. Accordingly, petitioner's improper jury charge claim is procedurally barred.

### B. Merits Analysis

#### 1. Improper Jury Charge

Notwithstanding that the Court, *supra*, has determined that petitioner has procedurally defaulted on his improper jury charge claim, the Court nonetheless proceeds to analyze the merits of this claim in an abundance of caution. Petitioner argues that the trial court improperly directed the jury to consider the mitigating effect petitioner's defense would have on his sentencing, and that the trial court's charge with respect to considering matters of sentencing and punishment was contradictory and confusing. (Pet. at 4.) Respondent argues that petitioner has failed to raise a constitutional question that is the subject of habeas review. (Resp. at 3-4.) The Court, in an abundance of caution, construes petitioner's claim as one alleging a violation of petitioner's due process rights. However, as set forth *infra*, having reviewed the trial record, the Court concludes that the trial court's jury charge was proper.

#### a. Legal Standard

Jury instructions violate due process if they "fail[ ] to give effect to [the] requirement" that the prosecution must prove every element of a charged offense beyond a reasonable doubt. *See Middleton v. McNeil*, 541 U.S. 433, 437, 124 S.Ct. 1830, 158 L.Ed.2d 701 (2004) (per curiam). However, "[a] state prisoner making a claim of improper jury instructions faces a substantial burden." *Del Valle v. Armstrong*, 306 F.3d 1197, 1200 (2d Cir. 2002). The petitioner must establish that "'[t]he ailing instruction by itself so infected the entire trial that the resulting conviction violat[ed] due process,' not merely [that] 'the instruction is undesirable, erroneous, or even universally condemned.'" *Id.* at 1201 (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977)); *see also Middleton*, 541 U.S. at 437 (explaining that, "[n]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation").

#### b. Application

Petitioner claims that the "trial court instructed the jury to consider the fact that, if it were to accept the [petitioner's] defense of extreme emotional disturbance, [petitioner's] conviction would be mitigated," and "[i]n doing so, the trial court shared its non-delegable judicial duty to assess issues relating to [petitioner's] sentence and punishment with the jury." (Pet App. Br. at 22-23.)[19] Specifically, the jury charge language petitioner claims was used in error is as follows:

> [I]f [the affirmative defense of extreme emotional disturbance is] proved, [that] does not relieve the defendant of responsibility for the homicide, but under our law it reduces the degree of the crime from murder in the second degree to manslaughter in the first degree. Remember, if you've already

---

[19] ("Pet. App. Br.") refers to the petitioner's brief in the Supreme Court of the State of New York, Appellate Division, Second Judicial Department.

10

> found the defendant not guilty of murder in the second degree, you will not consider the affirmative defense.

(T. 768; Pet. App. Br. at 22.) However, nowhere in this charging language is there any reference to sentencing or punishment. This language comes directly from the New York State Criminal Jury Instructions and was nothing more than a straightforward explanation of the purpose of an affirmative defense and instruction on how the jury was to proceed if the prosecution proved the elements required for Murder in the Second Degree, but the defendant also met the burden of proof for his affirmative defense. *See* N.Y.S. CJI § 125.25 (1)(a) (extreme emotional disturbance defense). In fact, the trial court's charge simply restated the language used in New York Penal Law § 125.20: "The fact that [a] homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree . . . ." N.Y. Penal Law. § 125.20.

Furthermore, the trial court's charge thoroughly explained not only the defendant's constitutional rights and the manner in which the jury was to evaluate the evidence before it, but also repeatedly emphasized the jury's duty to base its verdict solely on the evidence before it. (T. 746-65.) In fact, the court specifically told the jury that, "You may not consider or speculate about matters relating to sentence or punishment. That is a matter I alone must determine under our rules of law. I charge that you are not to consider or discuss any matters relating to sentence or punishment during your deliberations" (T. 749.) Thus, after reviewing the trial record, the Court fails to find any indication that the trial court improperly asked the jury to consider the "availability of a mitigated sentence," and, thus, the jury instruction did not violate the roles traditionally assigned to judge and jury.

For the reasons discussed *supra*, the Court also concludes that there is no basis to support petitioner's second claim that the trial court's jury charge with respect to sentencing and punishment was confusing in that the court "inconsistently directed the jury both <u>not to</u> consider petitioner's sentencing and punishment (T. 749) and <u>to</u> consider petitioner's sentencing and punishment (T. 768) making the charge contradictory on its face an impossible for the jury to follow." (Pet. Reply at 3 (emphasis in original.)) Accordingly, the trial court's jury charge was proper, and petitioner's request for habeas relief on the ground that the trial court's jury charge was improper is denied.

### 2. Ineffective Assistance of Trial Counsel

Petitioner argues that he was denied effective assistance of trial counsel because his trial defense counsel "proceeded on an 'inexplicably prejudicial course' absent any legitimate strategy," in that the only defense his trial counsel advanced was damaging to petitioner's case. (Pet. Reply at 7.) As set forth *infra*, having reviewed the record, the Court concludes that petitioner received effective assistance of trial counsel.

#### a. Legal Standard

Under the standard promulgated by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a petitioner is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an

11

objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694.

The first prong requires a showing that counsel's performance was deficient. However, constitutionally effective counsel embraces a "wide range of professionally competent assistance," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of trial counsel's actions under all circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Id.* at 319 (quoting *Rompilla v. Beard*, 545 U.S. 374, 408, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005)). In assessing performance, a court must apply a "heavy measure of deference to counsel's judgments." *Id.* 417 F.3d at 319 (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has reasonable justification for the decision," *DeLuca v. Lord*, 77 F.3d 578, 588 n. 3 (2d Cir. 1996), and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 588 (citing *Strickland*, 466 U.S. at 690–91). Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*

The second prong focuses on prejudice to the petitioner. The petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, "reasonable probability" means that the errors were of a magnitude such that they "undermine[ ] confidence in the [proceeding's] outcome." *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "The question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63–64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695).

b. Application

Here, petitioner's claim fails to satisfy the first prong of *Strickland*. In light of the overwhelming amount of incriminating evidence against the petitioner, including the petitioner's confession, petitioner's trial counsel's actions and decision to proffer the mitigating defense of extreme emotional disturbance cannot be said to lack any strategic or tactical justification, and, thus, are not objectively unreasonable. *See United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) (appellate courts are ill-suited to second-guess "the decisions of trial counsel unless there is no strategic or tactical justification for the course taken").

Petitioner's claim that his trial counsel was ineffective is predicated on two grounds: (1) his trial counsel failed to properly prepare the defense's sole witness, Dr. Siegel, for testimony;[20] and (2) Dr.

---

[20] It is not clear from petitioner's brief to this Court whether petitioner intends to raise this argument as he did in his brief to the Appellate Court. *See* (Pet.

12

Siegel's testimony was actually damaging to the defense's case, and thus, there could be no legitimate or strategic reason for calling Dr. Siegel. (Pet. App. Br. at 28; Pet. Reply at 8.)

In supporting his claim that his trial counsel failed to properly prepare Dr. Siegel for testimony, petitioner asserts that Dr. Siegel testified that he "could not say whether or not defense counsel <u>ever told him</u> that extreme emotional disturbance was being offered as a defense or that he was being asked to testify to establish that defense." (Pet. App. Br. at 28 (emphasis in original); T. 622-23.)) However, as Dr. Siegel explained during his testimony, when attorneys retain him as an expert witness it is usually because the attorney needs him to evaluate the defendant before the attorney can form a defense. (T. 623.) Thus, the fact that petitioner's trial counsel did not explain his defense to Dr. Siegel does not show the absence of a strategic or other legitimate explanation for his trial counsel's alleged shortcomings. *See Cabezudo v. Fischer*, No. CV-05-3168 (JS), 2009 WL 4723743, at *12 (E.D.N.Y. Dec. 1, 2009) (failure to prepare witness for testimony where the only other witness did not provide any beneficial testimony does not constitute ineffective assistance of counsel).

In supporting his claim that Dr. Siegel's testimony was actually damaging to the defense's case, petitioner asserts that "when [Dr. Siegel was] asked whether he believed that [the defendant's] actions were ultimately caused by 'high emotion' – the heart of [the defendant's] defense – Doctor Lawrence (sic) answered 'no.'" (Pet. Reply at 8); (T. 618.) However, it appears that petitioner is misreading the trial record. The question actually asked of Dr. Siegel was whether certain external "*stressors* we discussed [were] caused by high emotion," not whether the defendant had acted while in a highly emotional state. (T. 618 (emphasis added.)) Dr. Siegel answered this question by explaining that external stressors acting on the defendant, another factor used to support a finding of extreme emotional disturbance, were things such as his wife's infidelity, his residence in the United States with no other family present, and the fact that he was disabled. (T. 606-07, 618.) These factors supported the affirmative defense, and were offered in addition to the doctor's belief that the defendant had been in an extremely emotional state at the time of the murder, had acted spontaneously, and had demonstrated various other traits commonly exhibited by people acting under extreme emotional disturbance. (T. 605-619.) Thus, petitioner's assertions that his trial counsel failed to adequately prepare Dr. Siegel for testimony and that his trial counsel had no legitimate or strategic reason for calling Dr. Siegel, an experienced forensic psychologist, are without merit.

Furthermore, a review of the trial record demonstrates that petitioner's trial counsel acted as a persistent advocate for the petitioner at all stages of the proceedings against the petitioner. At the suppression hearing, petitioner's trial counsel thoroughly cross-examined the prosecition's witnesses and argued that the court should preclude physical evidence and the petitioner's statements to the police. (H. 14-27, 35-49, 56-58, 105-47, 163-76, 186-93, 193-96.)[21] At trial, petitioner's trial counsel thoroughly cross-examined the prosecution's witnesses, made timely and logical objections throughout, put forth a case in support of the only affirmative defense available to the

---

App. Br. at 28). However, this Court, in an abundance of caution, will proceed as if petitioner argues anew that his defense counsel failed to properly prepare Dr. Siegel for testimony.

[21] ("H.") refers to the suppression hearing transcript.

13

petitioner, and gave a reasoned and impassioned summation at the close of the trial. (T. 327, 332-36, 340-43, 364-70, 377-80, 386-90, 412-19, 451-91, 505-08, 525-32, 548-550, 567-619, 660-68, 675-711.) At sentencing, petitioner's trial counsel moved to set aside the verdict, and made every attempt to secure as lenient a sentence as possible for his client. (S. 3, 5-12.) Thus, the performance of petitioner's trial counsel was not objectively unreasonable. Accordingly, petitioner's claim of ineffective assistance of counsel must fail.

Although petitioner's failure to show deficient performance disposes of his ineffective assistance claim, the Court also finds that, even assuming *arguendo* that the trial counsel's performance was deficient, any alleged deficiencies in his trial counsel's performance did not result in prejudice to petitioner's case. "In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the 'cumulative weight error' in order to determine whether the prejudice 'reache[s] the constitutional threshold.' "*Sommerville v. Conway*, 281 F. Supp. 2d 515, 519 (E.D.N.Y. 2003) (quoting *Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir. 2001)). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. For the reasons discussed *supra*, there is no basis to conclude that, absent counsel's purported deficiencies, there was a reasonable probability that petitioner would have been found guilty of Manslaughter, rather than Murder in the Second Degree.

Accordingly, petitioner did not receive constitutionally deficient assistance of trial counsel. Thus, petitioner's request for habeas relief on the ground of ineffective assistance of trial counsel is denied. *See, e.g.*, *Dean v. Superintendent*, *Clinton Corr. Facility*, 93 F.3d 58, 60-63 (2d Cir. 1996) (holding effective assistance of counsel and dismissing habeas petition when petitioner claimed the defense proffered by trial counsel conflicted with petitioner's testimony).

V. CONCLUSION

For the reasons set forth herein, the Court finds that the petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254. Therefore, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: June 18, 2012
         Central Islip, New York

\* \* \*

Petitioner is proceeding *pro se*. Respondent is represented by Joanna R. Hershey, Esq., of the Nassau County District Attorney's Office, 262 Old Country Road, Mineola, New York, 11501.

14